IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Indenture Trustee under Trust Indenture dated February 1, 2007,<br><br>　　　　Plaintiff/Counter-Defendant,<br><br>　v.<br><br>LEAFS HOCKEY CLUB, INC.,<br><br>　　　　Defendant/Counter-Plaintiff, | Case No. 13 C 2247 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On May 31, 2013, Plaintiff Wells Fargo Bank (the "Trustee"),[1] as Indenture Trustee under the Trust Indenture dated February 1, 2007, filed a two-count First Amended Complaint against Defendant Leafs Hockey Club, Inc. ("Leafs Hockey") based on the Court's diversity jurisdiction. *See* 28 U.S.C. § 1332(a). On December 17, 2013, Leafs Hockey filed a three-count Counterclaim against the Trustee alleging a breach of contract claim (Count I), an equitable accounting claim (Count II), and a conspiracy to defraud claim (Count III). Before the Court is the Trustee's motion to dismiss Leafs Hockey's three-count Counterclaim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the following reasons, the Court grants the Trustee's motion to dismiss without prejudice. The Court grants Leafs Hockey leave to file an

---

[1] On January 24, 2014, the Court granted Plaintiff's motion to substitute UMB Bank, N.A. as Plaintiff/Trustee in this case. (R. 52.) The fact that UMB Bank accepted all of the duties as trustee under the Trust Indenture pursuant to the December 17, 2013 Acceptance of Successor Trusteeship does not change the status and substance of this litigation. (R. 40-1, Ex. A.) Therefore, Wells Fargo is no longer the Counter-Defendant in this lawsuit. Instead, UMB Bank is both Plaintiff/Trustee and Counter-Defendant.

Amended Counterclaim.

## LEGAL STANDARD

**I.     Federal Rule of Civil Procedure 12(b)(6)**

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff,* 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts] accept the well-pleaded facts in the complaint as true." *Alam v. Miller Brewing Co.,* 709 F.3d 662, 665-66 (7th Cir. 2013). When ruling on motions to dismiss, courts may also consider documents attached to the pleadings without converting the motion to dismiss into a motion summary judgment, as long as the documents are referred to in the complaint and central to the plaintiff's claims. *See Geinosky v. City of Chicago,* 675 F.3d 743, 745 n.1 (7th Cir. 2012).

**II.     Federal Rule of Civil Procedure 9(b)**

In pleading fraud in federal court, Rule 9(b) imposes a higher pleading standard than that

2

required under Rule 8(a)(2). *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 446 (7th Cir. 2011). Specifically, Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud. *See* Fed. R. Civ. P. 9(b); *Pirelli*, 631 F.3d at 441-42; *see also Iqbal,* 556 U.S. at 686. This "ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank*, 649 F.3d at 615 (citation omitted); *see also Cincinnati Life Ins. Co. v. Beyrer*, 772 F.3d 939, 948 (7th Cir. 2013). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); *see also Iqbal,* 556 U.S. at 686. "[T]he particularity requirement of Rule 9(b) is designed to discourage a 'sue first, ask questions later' philosophy." *Pirelli,* 631 F.3d at 441 (citation omitted). "Heightened pleading in the fraud context is required in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." *Id.* at 442.

## BACKGROUND

### I. Wells Fargo's First Amended Complaint

In its First Amended Complaint, Plaintiff alleges that it is the successor trustee to the Amalgamated Bank of Chicago under the Trust Indenture between the Illinois Finance Authority and the Prior Trustee dated as of February 1, 2007 (the "Trust Indenture"). (R. 13, First Am. Compl. ¶ 1.) Plaintiff alleges that the Illinois Finance Authority raised $20 million through the issuing and selling a series of revenue bonds. (*Id*. ¶¶ 7, 8.) The Illinois Finance Authority issued the bonds under the Trust Indenture and loaned the proceeds to LHC, LLC ("LHC"), an Illinois non-profit limited liability company, for the construction and operation of a hockey arena located

3

in West Dundee, Illinois. (*Id.* ¶ 1.) Pursuant to the February 1, 2007 Loan Agreement ("Loan Agreement") and Guaranty Agreement ("Guaranty Agreement"), LHC was the borrower and Defendant Leafs Hockey was the guarantor. (*Id.*) Plaintiff further alleges that LHC has failed to make the required payments, and thus is in default. (*Id.* ¶ 2.) Also, Plaintiff maintains that Leafs Hockey, as guarantor, has failed to pay its obligations under the February 1, 2007 Guaranty Agreement. (*Id.*) On January 24, 2014, the Court granted Wells Fargo's motion for substitution and appointed UMB Bank, N.A. ("UMB" or the "Trustee") as the successor trustee.

## II.    Leafs Hockey's Counterclaim

On January 17, 2014, Leafs Hockey filed a three-count Counterclaim against the Trustee alleging a breach of contract claim (Count I), a claim for an equitable accounting (Count II), and a conspiracy to defraud claim (Count III). In Count III, Leafs Hockey also brings the conspiracy to defraud claim as a Third-Party claim against Third-Party Defendants Don LaPato, John Willett, Michael Durkin, and Club-Sports Consulting Group, Inc. ("CSCG").

In its Counterclaim, Leafs Hockey alleges that it repeatedly attempted to obtain information from the Trustee, the Illinois Finance Authority, and CSCG — the manager of operations at the hockey arena — about the distribution and use of funds from the $20 million bond proceeds. (*Id.* ¶ 28.) Despite the repeated attempts, Leafs Hockey was unable to learn why approximately $6 to $8 million of the bond proceeds were not used to fund the construction of the hockey arena (*Id.*) Leafs Hockey further alleges that in or around February 2007, when the construction of the hockey arena began, it had approximately $500,000 in reserves, but by late 2012, approximately $470,000 of the reserves was missing. (*Id.* ¶¶ 30, 31.) Also, Leafs Hockey asserts that in or about 2012, it began to suspect LHC's oversight and CSCG's management of

4

the hockey arena as the cause of the financial irregularities.  (*Id*. ¶ 32.)

Further, Leafs Hockey alleges that on December 11, 2012, it replaced the entire board of directors of LHC, which included LaPato, Willett, and Durkin.  (*Id*. ¶¶ 33, 34.)  According to Leafs Hockey, within days, CSCG removed all physical records, including all accounting records, from the hockey arena and deleted Leafs Hockey's emails and computer records.  (*Id*. ¶¶ 36, 37.)  After Leafs Hockey terminated CSCG as manager, Leafs Hockey also discovered a remote server at the hockey arena that enabled CSCG access to electronic business activity on a going-forward basis.  (*Id*. ¶ 40.)

After Leafs Hockey terminated CSCG as the manager of the hockey rink, Leafs Hockey discovered that there were chronic unrepaired gas leaks at the rink, the rink's HVAC equipment was in disrepair, and other defects in the construction of the hockey arena.  (*Id*. ¶¶ 43, 46, 49.)  Leafs Hockey also alleges that it uncovered advertising, vending, and restaurant revenue that was uncollected or not recorded in the books and records.  (*Id*. ¶¶ 51, 52, 54.)  Furthermore, Leafs Hockey maintains that family members of CSCG were on the payroll for no valid business purpose.  (*Id*. ¶¶ 56, 57.)  According to Leafs Hockey, CSCG also transferred money and supplies from the hockey arena to North Shore Ice Arena, which CSCG also managed.  (*Id*. ¶¶ 63, 64.)

In early 2012, CSCG sought to extend its contract to manage the hockey rink for six more years.  (*Id.* ¶ 74.)  Leafs Hockey's President Danielle Gulli expressed her concern to a Vice President at Wells Fargo, Virginia Housum, about LaPato's conflict with renegotiating CSCG's contract because LaPato was the owner of CSCG and also a board member of LHC.  (*Id*. ¶ 78.)  In addition, Gulli told Housum that no bids had been sought or obtained from other management

5

companies and that the length of the contract extension sought by CSCG was imprudent in light of LHC's financial problems. (*Id*.) According to Leafs Hockey, Housum then advised Gulli that if the management contract was not renewed, the Indenture Trustee, at that time Wells Fargo, had the ability to exercise its legal rights with regard to the guaranty executed by Leafs Hockey. (*Id*. ¶ 79.) Housman further advised Gulli that failure to agree to CSCG's contract extension could result in personal liability for members of Leafs Hockey's board members. (*Id*. ¶ 80.) Leafs Hockey further contends that Housum told Gulli that it would be in her best interest to move forward with the extension of CSCG's contract. (*Id*. ¶ 81.) In or about June 2012 — prior to the replacement of LHC's entire board — LHC approved a new management contract with CSCG. (*Id*. ¶ 82.)

## ANALYSIS

**I.     Breach of Contract Claim — Counterclaim I**

The Trustee argues that Leafs Hockey has failed to properly allege its breach of contract and equitable accounting claims under the federal pleading standards. The parties do not dispute that Illinois law governs the present breach of contract and accounting claims. *See Auto–Owners Ins. Co. v. Websolv Computing, Inc.,* 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (internal citation and quotation marks omitted). To establish a breach of contract claim under Illinois law, a plaintiff must show: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Hess v. Kanoski & Assoc.,* 668 F.3d 446, 452 (7th Cir. 2012) (citation omitted); *see also Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 754, 371 Ill.Dec. 550, 566 (1st Dist. 2013).

Leafs Hockey alleges that pursuant to Section 4.3 of the Loan Agreement, the Trustee was only to disburse the money on deposit in accordance with the terms of Section 3.3 of the Trust Indenture. (*Id.* ¶ 169.) Further, Leafs Hockey alleges that Section 3.3 of the Trust Indenture provides detailed instructions as to how the Trustee shall pay out funds for the construction of the hockey arena. (*Id.* ¶ 170.) Also, Section 6.2 of the Trust Indenture states that the Indenture Trustee shall keep proper books and records of all funds and accounts established or pursuant to the Trust Indenture. (*Id.* ¶ 172.) Leafs Hockey alleges on information and belief that the Trustee did not disburse the money on deposit in accordance with Section 3.3 of the Trust Indenture and paragraphs 4.3 and 9.1 of the Loan Agreement. (*Id.* ¶ 173.) According to Leafs Hockey, when it requested to review the books and records of the Trustee relating to the disbursements made, the Trustee declined Leafs Hockey's request. (*Id.* ¶¶ 175, 176.) Leafs Hockey further contends that on information and belief, the Trustee did not keep accurate and thorough records regarding the money advanced for the construction of the hockey arena, and thus the Trustee breached the terms of the Loan Agreement and the Trust Indenture. (*Id.* ¶¶ 177, 178.)

In its motion to dismiss, the Trustee argues that Leafs Hockey has failed to set forth any facts or grounds explaining how and in what manner the Trustee breached these agreements. The Court agrees. Even when accepting the well-pleaded facts in Leafs Hockey's Counterclaim as true, the Counterclaim's allegations fall short of explaining how the Trustee breached the Loan Agreement and the Trust Indenture. To state a claim that is plausible on its face, Leafs Hockey must provide "some facts that suggest a right to relief that is beyond the 'speculative level.'" *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). In other words, "[a] claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Here, Leafs Hockey has failed this test because it has not provided "enough details about the subject-matter of the case to present a story that holds together." *Engel v. Buchan,* 710 F.3d 698, 709 (7th Cir. 2013) (citation omitted). The Court therefore grants the Trustee's motion to dismiss Leafs Hockey's breach of contract claim without prejudice and also grants Leafs Hockey leave to file an Amended Counterclaim in accordance with this Memorandum, Opinion, and Order.

That being said, the Trustee also argues that Leafs Hockey's allegations are insufficient because Leafs Hockey bases some of its allegations "upon information and belief." Allegations made on information and belief, however, are acceptable under the federal pleading standards. *See Boykin v. KeyCorp,* 521 F.3d 202, 215 (2d Cir. 2008) (Sotomayor, J.); *Trustees of the Auto. Mechanics' Indus. Welfare & Pension Funds Local 701 v. Elmhurst Lincoln Mercury,* 677 F.Supp.2d 1053, 1054-55 (N.D. Ill. 2010); *see also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1224 ("Although there is no express authorization in the federal rules for pleading on information and belief, allegations in this form have been held to be permissible, even after the *Twombly* and *Iqbal* decisions.") (internal footnotes omitted). Therefore, the Trustee's argument is misplaced.

Also, the Trustee's argument that Leafs Hockey's allegations are unsupportable based on the Limited Offering Statement dated February 20, 2007 — which the Trustee attached to its memorandum in support of its motion to dismiss — is also misplaced because the Court cannot consider the Limited Offering Statement without converting the present motion to dismiss into a

motion for summary judgment. *See* Fed.R.Civ.P. 12(d); *Rutherford v. Judge & Dolph, Ltd.,* 707 F.3d 710, 713-14 (7th Cir. 2013). More specifically, because Leafs Hockey does not refer to this document in its Counterclaim, the Court cannot incorporate it by reference. *See Rutherford,* 707 F.3d at 713; *Brownmark Films, LLC v. Comedy Partners,* 682 F.3d 687, 690 (7th Cir. 2012).

## II.  Accounting Claim — Counterclaim II

Next, the Trustee argues that Leafs Hockey has failed to sufficiently allege its Illinois equitable claim for an accounting under the federal pleading standards. "To state a claim for the equitable relief of an accounting, a plaintiff must allege the absence of an adequate remedy at law." *Kempner Mobile Elec. Inc. v. Southwestern Bell Mobile Sys.,* 428 F.3d 706, 715 (7th Cir. 2005) (citing *Mann v. Kemper Fin. Co., Inc.,* 247 Ill.App.3d 966, 980, 618 N.E.2d 317, 187 Ill.Dec. 726 (1st Dist. 1992)). "In addition to the absence of an adequate remedy at law, the plaintiff must allege at least one of the following: (1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature." *Kempner,* 428 F.3d at 715.

In its motion, the Trustee specifically argues that Leafs Hockey's allegations for an accounting are deficient because it merely recites the elements of an accounting claim and alleges that it requested to review the books and records of the Trustee, but the Trustee declined Leafs Hockey's request. (*Id.* ¶¶ 175, 176, 181-182.) Indeed, Leafs Hockey's accounting claim "'must contain allegations plausibly suggesting (not merely consistent with)' an entitlement to relief." *Alam*, 709 F.3d at 666 (quoting *Twombly*, 550 U.S. at 557). In other words, accepting the well-pleaded facts in the Counterclaim as true, Leafs Hockey must do more than allege labels and conclusions. *See Twombly,* 550 U.S. at 555; *see also McCauley v. City of Chicago,* 671 F.3d

9

611, 617 (7th Cir. 2011) (alleged "facts" [that] are actually legal conclusions or elements of the cause of action, [] may be disregarded on a motion to dismiss."). As the Seventh Circuit teaches, "[t]he Rules of Civil Procedure set up a system of notice pleading," under which, "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful." *Bank of Am., N.A. v. Knight,* 725 F.3d 815, 818 (7th Cir. 2013). Moreover, Leafs Hockey's fraud allegations, as discussed below, do not save the day. As such, the Court grants the Trustee's motion to dismiss Leafs Hockey's accounting claim as alleged in Counterclaim II without prejudice and grants Leafs Hockey leave to file an amended accounting claim in its Amended Counterclaim.

### III.  Conspiracy to Defraud — Count III

Last, the Trustee moves to dismiss Leafs Hockey's conspiracy to defraud claim against it pursuant to Rule 9(b). *See Wojcik v. InterArch, Inc.,* No. 13 C 1332, 2013 WL 5904996, at *11 (N.D. Ill. Nov. 4, 2013) ("In federal court, a claim for conspiracy to commit fraud must meet the heightened pleading standard that Rule 9(b) imposes."). "The elements of a cause of action for conspiracy to defraud are: (1) a conspiracy; (2) an overt act of fraud in furtherance of the conspiracy; and (3) damages to the plaintiff as a result of the fraud." *Bosak v. McDonough,* 192 Ill.App.3d 799, 803, 549 N.E.2d 643, 139 Ill.Dec. 917 (1st Dist. 1989); *see also GMAC, LLC v. Hillquist,* 652 F.Supp.2d 908, 922 (N.D. Ill. 2009). "A 'conspiracy' is a combination of two or more persons to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means." *Bosak,* 192 Ill.App.2d at 803. A claim for fraud under Illinois law includes the following elements: "(1) a false statement of material fact; (2) by one who knows or believes it to be false; (3) made with the intent to induce action by another in reliance on the statement; (4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other

10

resulting from that reliance." *Siegel Dev., LLC v. Peak Const. LLC*, 993 N.E.2d 1041, 1059, 373 Ill.Dec. 482, 500 (1st Dist. 2013).

In its Counterclaim, Leafs Hockey's fraud allegations in relation to the Trustee consist of the following:

> On information and belief[,] Lapato, CSCG, Willett, and Durkin were assisted in such scheme by the Indenture Trustee, which participated in the scheme to defraud by, among other things, consenting to and approving the hiring of CSCG as the manager of the Rink; looking the other way as payouts, distributions, and advances under the Trust Indenture and the Loan Agreement were made[;] knowing or choosing not to know that such funds were being misused by Lapato, CSCG, Willett, and Durkin; looking the other way as $20 million of payouts, distributions, and advances under the Trust Indenture and the Loan Agreement were made, even though the Indenture Trustee knew or ignored the evidence that, on information and belief, the actual cost of construction of the Rink was on the order of $12 to 14 million; electing not to require thorough reports from and access to the books and records of LHC and CSCG; electing not to monitor the use by LHC and CSCG of the reserves and funds of Leafs Hockey; insisting on extending CSCG's management contract long before such contract terminated, at a cost imposing an enlarged financial burden on LHC; and threatening noncompliant board members of LHC with personal liability if LHC did not extend CSCG's management contract.

(Countercl. ¶ 216.)

Leafs Hockey's conspiracy to defraud allegations lack sufficient detail under the Rule 9(b) heightened pleading standard, which requires describing the "who, what, when, where, and how" of the fraud. *See AnchorBank*, 649 F.3d at 615. Leafs Hockey, for example, does not explain who the noncompliant board members are that the Trustee threatened with personal liability. Further, Leafs Hockey's allegation that the Trustee "looked the other way" is speculative and Leafs Hockey's clarification that the Trustee was "unmindful" of what was going on in relation to Lapato, CSCG, Durkin, and Willett does not amount to an allegation that the Trustee made an "an overt act of fraud in furtherance of the conspiracy" or that there was any

11

"concerted action" on the part of the Trustee. *See Bosak,* 192 Ill.App.3d at 803.

In addition, although Leafs Hockey alleges a "scheme to defraud," it fails to set forth any allegations that the Trustee had an agreement with the Third-Party Defendants to defraud Leafs Hockey, which is a necessary element of a civil conspiracy claim under Illinois law. *See Merrilees v. Merrilees*, 998 N.E.2d 147, 162, 375 Ill.Dec. 855, 870 (1st Dist. 2013) ("To connect a defendant to a conspiracy, the complaint must allege the 'necessary and important element' of an agreement."); *cf. Knight,* 725 F.3d at 818 (under federal pleading standard "it remains essential to show that a particular defendant joined the conspiracy and knew of its scope."). In other words, Leafs Hockey's conspiracy to defraud allegations are not sufficient to state a claim that is plausible on its face, *see Iqbal,* 556 U.S. at 678, let alone under Rule 9(b)'s specificity requirements. *See Borsellino v. Goldman Sachs Group, Inc.,* 477 F.3d 502, 509 (7th Cir. 2007) (the complaint must allege "the nature of the purported agreement to defraud the plaintiffs, such as when it was made or which individuals ... arranged the conspiracy.").

Moreover, as the Trustee points out, many of Leafs Hockey's fraud allegations are based upon information and belief. *See Cincinnati Life Ins.,* 722 F.3d at 948 (courts "frown on making allegations 'on information and belief' in the fraud context and generally find that such claims do not meet Rule 9(b)'s particularity requirement."). "The general rule that fraud cannot be pled based on information and belief is not ironclad, however: the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" *Pirelli,* 631 F.3d at 443. Although Leafs Hockey argues that the facts necessary to provide further details of the alleged fraud are within the Trustee's knowledge, Leafs Hockey fails to provide grounds for its suspicions that the Trustee was part of

12

the conspiracy to defraud.  *See id.* ("The grounds for the plaintiff's suspicions must make the allegations plausible, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail.").  Put differently, even with its limited knowledge, Leafs Hockey has failed to sufficiently describe the conspiracy to defraud in order for the Trustee to respond effectively.  *See Cincinnati Life Ins.,* 722 F.3d at 949.

Accordingly, the Court grants the Trustee's motion to dismiss Leafs Hockey's conspiracy to defraud claim as alleged in Count III of the Counterclaim.  The Court further grants Leafs Hockey leave to file an Amended Counterclaim in accordance with this opinion.

## CONCLUSION

For these reasons, the Court grants Plaintiff/Counter-Defendant's motion to dismiss without prejudice and grants Defendant/Counter-Plaintiff leave to file an Amended Counterclaim.

**Dated**:  March 14, 2014

                                                 **ENTERED**

                                             **AMY J. ST. EVE**
                                             **United States District Court Judge**