# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Indenture Trustee under Trust Indenture dated February 1, 2007, | ) ) ) | |
| | ) | Case No. 13 C 2247 |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LEAFS HOCKEY CLUB, INC., | ) | |
| | ) | |
| Defendant/Counter-Plaintiff, | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

After the Court granted Plaintiff/Counter-Defendant UMB Bank's ("UMB" or "Plaintiff") motion to dismiss Defendant/Counter-Plaintiff Leafs Hockey Club, Inc.'s ("Leafs Hockey") Counterclaim without prejudice,[1] Leafs Hockey filed the present Amended Counterclaim on May 28, 2014. In the three-count Amended Counterclaim, Leafs Hockey alleges a breach of contract claim (Count I), an equitable accounting claim (Count II), and a conspiracy to defraud claim (Count III). Before the Court is the UMB's motion to dismiss Leafs Hockey's three-count Counterclaim brought pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the following reasons, the Court grants Plaintiff's motion to dismiss Leafs Hockey's conspiracy to defraud claim as alleged in Count III with prejudice. The Court denies the remainder of Plaintiff's motion to dismiss as to Leafs Hockey's breach of contract claim as alleged in Count I and alternative equitable accounting claim in Count II. Plaintiff's Answer to

---

[1] The Court presumes familiarity with its March 14, 2014, Memorandum, Opinion, and Order granting Plaintiff's first motion to dismiss without prejudice.

the Amended Counterclaim is due on or before August 14, 2014.

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 12(b)(6)

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff,* 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation omitted). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). "In reviewing the sufficiency of a complaint under the plausibility standard, [courts] accept the well-pleaded facts in the complaint as true, *Alam v. Miller Brewing Co.,* 709 F.3d 662, 665-66 (7th Cir. 2013), and draw "reasonable inferences in favor of the plaintiffs." *Teamsters Local Union No. 705 v. Burlington No. Santa Fe, LLC,* 741 F.3d 819, 823 (7th Cir. 2014).

### II. Federal Rule of Civil Procedure 9(b)

In pleading fraud in federal court, Rule 9(b) imposes a higher pleading standard than that required under Rule 8(a)(2). *See Bank of America, N.A. v. Knight,* 725 F.3d 815, 818 (7th Cir. 2013); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436,

446 (7th Cir. 2011). Specifically, Rule 9(b) requires a pleading to state with particularity the circumstances constituting the alleged fraud, which requires "the who, what, when, where, and how: the first paragraph of any newspaper story." *Knight,* 725 F.3d at 818 (quotation marks and citation omitted). "[T]he particularity requirement of Rule 9(b) is designed to discourage a 'sue first, ask questions later' philosophy." *Pirelli,* 631 F.3d at 441 (citation omitted). "Heightened pleading in the fraud context is required in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." *Id.* at 442.

## BACKGROUND

### I.      First Amended Complaint

Plaintiff, the successor trustee under the Trust Indenture between the Illinois Finance Authority and the prior trustee ("Trustee") dated February 1, 2007, alleges that the Illinois Finance Authority raised $20 million through the issuing and selling of a series of revenue bonds. (R. 13, First Am. Compl. ¶¶ 7, 8.) The Illinois Finance Authority issued the bonds under the Trust Indenture and loaned the proceeds to LHC, LLC ("LHC"), an Illinois non-profit limited liability company, for the construction and operation of a hockey arena located in West Dundee, Illinois. (*Id.* ¶ 1.) Pursuant to the February 1, 2007 Loan Agreement ("Loan Agreement") and Guaranty Agreement ("Guaranty Agreement"), LHC was the borrower and Defendant Leafs Hockey was the guarantor. (*Id.*) Plaintiff further alleges that LHC has failed to make the required payments, and therefore, is in default. (*Id*. ¶ 2.) Also, Plaintiff asserts that Leafs Hockey, as guarantor, has failed to pay its obligations under the Guaranty Agreement. (*Id.*)

### II.      Leafs Hockey's Amended Counterclaim

In its Amended Counterclaim, Leafs Hockey alleges that it repeatedly attempted to obtain information from the Trustee, the Illinois Finance Authority, LHC, and CSCG, the manager of operations at the hockey arena, about the distribution and use of funds from the $20 million bond proceeds. (R. 93, Am. Countercl. ¶ 28.) Despite these repeated attempts, Leafs Hockey was unable to learn why approximately $6 to $8 million of the bond proceeds were not used to fund the construction of the hockey arena (*Id.*) Leafs Hockey further alleges that in or around February 2007, when the construction of the hockey arena began, it had approximately $500,000 in reserves, but by late 2012 approximately $470,000 of the reserves was missing. (*Id.* ¶¶ 30, 31.) In addition, Leafs Hockey asserts that in or about 2012, it began to suspect LHC's oversight and CSCG's management of the hockey arena caused the financial irregularities. (*Id.* ¶ 32.)

Furthermore, Leafs Hockey alleges that on December 11, 2012, it replaced the entire board of directors of LHC, which included Don LaPato, John Willett, and Michael Durkin. (*Id.* ¶¶ 33, 34.) According to Leafs Hockey, within days, CSCG removed all physical records, including all accounting records, from the hockey arena and deleted Leafs Hockey's emails and computer records. (*Id.* ¶¶ 36, 37.) After Leafs Hockey terminated CSCG as manager, Leafs Hockey also discovered a remote server at the hockey arena that enabled CSCG access to electronic business activity on a going-forward basis. (*Id.* ¶ 40.) The rink had chronic unrepaired gas links, the rink's HVAC equipment was in disrepair, and the hockey arena had other construction defects. (*Id.* ¶¶ 43, 46, 49.) Moreover, Leafs Hockey alleges that it uncovered advertising, vending, and restaurant revenue that was uncollected or not recorded in the books and records. (*Id.* ¶¶ 51, 52, 54.) Leafs Hockey also asserts that family members of CSCG were on the payroll for no valid business purpose. (*Id.* ¶¶ 56, 57.) According to Leafs

4

Hockey, CSCG also transferred money and supplies from the hockey arena to North Shore Ice Arena that CSCG also managed. (*Id*. ¶¶ 63, 64.)

In early 2012, CSCG sought to extend its contract to manage the hockey rink for six more years. (*Id*. ¶ 74.) Leafs Hockey's President Danielle Gulli expressed her concern to a Vice President at Plaintiff's predecessor in interest, Wells Fargo Bank, Virginia Housum, about LaPato's conflict with renegotiating CSCG's contract because LaPato owned CSCG and also served as a board member of LHC. (*Id*. ¶ 78.) In addition, Gulli told Housum that no bids had been sought or obtained from other management companies and that the length of the contract extension sought by CSCG was imprudent in light of LHC's financial problems. (*Id*.) Leafs Hockey further alleges that Housum then advised Gulli that if the management contract was not renewed, the Indenture Trustee, at that time Wells Fargo, had the ability to exercise its legal rights with regard to the guaranty executed by Leafs Hockey. (*Id*. ¶ 79.) Housman also advised Gulli that failure to agree to CSCG's contract extension could result in personal liability for members of Leafs Hockey's board members. (*Id*. ¶ 80.) Moreover, Leafs Hockey contends that Housum told Gulli that it would be in her best interest to move forward with the extension of CSCG's contract. (*Id*. ¶ 81.) In or about June 2012 — prior to the replacement of LHC's entire board — LHC approved a new management contract with CSCG. (*Id.* ¶ 82.)

## ANALYSIS

**I.      Breach of Contract Claim — Count I**

Plaintiff argues that Leafs Hockey has failed to properly allege its breach of contract claim under the federal pleading standards. The parties do not dispute that Illinois law governs Leafs Hockey's claims. "A breach of contract under Illinois law requires a valid contract,

5

performance by the plaintiff, breach by the defendant, and damages." *Norem v. Lincoln Ben. Life Co.,* 737 F.3d 1145, 1148 (7th Cir. 2013); *see also Matthews v. Chicago Transit Auth.*, 9 N.E.3d 1163, 1193 (1st Dist. 2014).

Here, Leafs Hockey alleges that pursuant to 4.3 of the Loan Agreement, the Trustee was only to disburse the money on deposit in accordance with the terms of Section 3.3 of the Trust Indenture. (Am. Countercl. ¶ 169.) Furthermore, Leafs Hockey contends that Section 3.3 of the Trust Indenture provides detailed instructions as to how the Trustee shall pay out funds for the construction of the hockey arena. (*Id.* ¶ 170.) Also, Leafs Hockey alleges that Paragraph 9.1 of the Loan Agreement states that LHC agrees that none of its money, property, or other assets will be distributed to any of its members, directors, or officers, or inure to the benefit of any private person, association, or borrow. (*Id.* ¶ 171.) Section 6.2 of the Trust Indenture states that the Trustee shall keep proper books and records of all funds and accounts established or pursuant to the Trust Indenture. (*Id.* ¶ 172.)

Leafs Hockey further alleges that the Trustee knew that LaPato was both a board member of LHC and the owner of CSCG — the company that managed the hockey arena. (*Id.* ¶ 173.) According to Leafs Hockey, the Trustee frequently participated in conference calls with LHC board members and bondholder representatives to discuss LHC's financial performance and strategies for enabling LHC to make payments of principal and interest on the bonds and comply with LHC's obligations under the Loan Agreement and Trust Indenture. (*Id.* ¶ 174.) On information and belief, such conference calls were held quarterly and LaPato, Durkin, and Willett each participated in most of these conference calls. (*Id.* ¶ 175.) Also on information and belief, Leafs Hockey alleges that the Trustee knew that LHC's property and assets inured to the

benefit of LaPato, which Paragraph 9.1 of the Loan Agreement prohibited. (*Id.* ¶¶ 171, 176.)

Further, Leafs Hockey asserts that the Trustee knew that LaPato's dual role posed problems for

LHC applying for a non-homestead property tax exemption for the hockey arena and that the

eventual denial of this tax exemption cost LHC approximately $160,000 in additional property

taxes. (*Id.* ¶¶ 177, 180.)

Leafs Hockey also alleges on information and belief that the Trustee did not disburse the

money on deposit pursuant to Section 3.3 of the Trust Indenture or in accordance with

Paragraphs 4.3 and 9.1 of the Loan Agreement. (*Id.* ¶ 183.) Further, when Leafs Hockey

requested to review the books and records of the Trustee relating to the disbursements made, the

Trustee declined Leafs Hockey's request. (*Id.* ¶¶ 185, 186.) Leafs Hockey further contends that

on information and belief, the Trustee did not keep accurate and thorough records regarding the

money advanced for the construction of the hockey arena, and thus the Trustee breached the

terms of the Loan Agreement and the Trust Indenture. (*Id.* ¶¶ 187, 188.)

Unlike Leafs Hockey's original breach of contract allegations, viewing its allegations and

all reasonable inferences in its favor, Leafs Hockey has provided sufficient, detailed allegations

that the Trustee breached the Loan Agreement and Trust Indenture. Leafs Hockey, for example,

alleges that the Trustee knew that LHC's property and assets inured to the benefit of LaPato,

which states a plausible claim for breaching Paragraph 9.1 of the Loan Agreement. *See*

*Twombly,* 550 U. S. at 557 (complaint must contain "allegations plausibly suggesting (not

merely consistent with)" a right to relief). In addition, Leafs Hockey maintains that the Trustee

breached Section 3.3 of the Trust Indenture and Paragraphs 4.3 and 9.1 of the Loan Agreement

because the Trustee did not properly disburse the money on deposit. Also, the Trustee's denial

of allowing Leafs Hockey's request to review the books and records relating to the disbursements made, raises a reasonable inference that the Trustee may not have kept proper books and records under Section 6.2 of the Trust Indenture. *See Iqbal,* 556 U.S. at 678 ( "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Because Leafs Hockey's allegations state a right to relief above a speculative level, *see Twombly,* 550 U.S. at 555, the Court denies Plaintiff's motion to dismiss Leafs Hockey's breach of contract claim.

## II.     Accounting Claim — Count II

Next, Plaintiff argues that Leafs Hockey has failed to sufficiently allege its Illinois equitable claim for an accounting under the federal pleading standards. "To state a claim for the equitable relief of an accounting, a plaintiff must allege the absence of an adequate remedy at law." *Kempner Mobile Elec. Inc. v. Southwestern Bell Mobile Sys.,* 428 F.3d 706, 715 (7th Cir. 2005) (citing *Mann v. Kemper Fin. Co., Inc.,* 247 Ill.App.3d 966, 980, 618 N.E.2d 317, 187 Ill.Dec. 726 (1st Dist. 1992)). "In addition to the absence of an adequate remedy at law, the plaintiff must allege at least one of the following: (1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature." *Kempner,* 428 F.3d at 715.

In Leafs Hockey's Amended Counterclaim, it alleges that it does not have an adequate remedy at law. (Am. Countercl. ¶ 191.) Moreover, Leafs Hockey contends that on information and belief, LHC made use of $12 to $14 million of bond funds for the construction of the hockey arena, but may have used additional bond funds for other purposes. (*Id*. ¶ 192.) Further, § 6.2 of

the Trust Indenture obligated the Trustee to keep books and records of disbursements to LHC

and the reasons for such disbursements. (*Id.*) Leafs Hockey also alleges on information and

belief that its computer records and other records were erased or destroyed at the direction of

LaPato in or about February 2013. (*Id.* ¶ 193.) In addition, Leafs Hockey asserts that it is in

need of discovery from the Trustee that only an accounting can satisfy. (*Id.* ¶ 194.) The set of

accounts between the Trustee and LHC involved two series of bonds that were issued for

different purposes, such as construction, repair, payment of interest, and maintenance of

reserves. (*Id.* ¶ 195.) Leafs Hockey further contends that the $20 million that the Trustee seeks

to recover from Leafs Hockey involved numerous transactions between the Trustee and LHC to

which Leafs Hockey was not a party. (*Id.* ¶ 197.)

Viewing these allegations in Leafs Hockey's favor, not only has Leafs Hockey alleged a

lack of a legal remedy, but it has sufficiently alleged a need for discovery and the existence of

mutual accounts that are complex due to the segregated accounts. *See Kempner,* 428 F.3d at

715. Also, Leafs Hockey has alleged that the Trustee has exclusive control of the records further

adding to the plausibility of its allegations that it needs discovery under the circumstances. *See*

*Hartigan v. Candy Club*, 149 Ill.App.3d 498, 501, 501 N.E.2d 188, 103 Ill.Dec. 167 (1st Dist.

1986); *see also Cumis Ins. Soc., Inc. v. Peters,* 983 F.Supp. 787, 797 (N.D. Ill. 1997).

Leafs Hockey has thus sufficiently alleged its accounting claim under the federal

pleading standards stating its right to relief above the speculative level, *see Twombly,* 550 U.S. at

555, by providing sufficient details present "to present a story that holds together." *Swanson v.*

*Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). Finally, despite Plaintiff's argument to the

contrary, Rule 8(d)(2) allows litigants to plead in the alternative, therefore, Leafs Hockey's

equitable accounting allegations are not inconsistent with its breach of contract claim. The Court

recognizes, however, that Leafs Hockey cannot succeed under both theories of liability, but at

this procedural posture, federal courts allow such contradictory, alternative allegations. *See, e.g.,*

*Mitchell v. United Med. Sys., Inc.*, No. 10 C 6273, 2011 WL 1526985, at *5 (N.D. Ill. Apr. 20,

2011).

**III.    Conspiracy to Defraud — Count III**

Last, Plaintiff moves to dismiss Leafs Hockey's conspiracy to defraud claim against it

pursuant to Rule 9(b). *See Wojcik v. InterArch, Inc.,* No. 13 C 1332, 2013 WL 5904996, at *11

(N.D. Ill. Nov. 4, 2013) ("In federal court, a claim for conspiracy to commit fraud must meet the

heightened pleading standard that Rule 9(b) imposes."). "The elements of a cause of action for

conspiracy to defraud are: (1) a conspiracy; (2) an overt act of fraud in furtherance of the

conspiracy; and (3) damages to the plaintiff as a result of the fraud." *Bosak v. McDonough,* 192

Ill.App.3d 799, 803, 549 N.E.2d 643, 139 Ill.Dec. 917 (1st Dist. 1989); *see also GMAC, LLC v.*

*Hillquist,* 652 F.Supp.2d 908, 922 (N.D. Ill. 2009). "A 'conspiracy' is a combination of two or

more persons to accomplish by concerted action an unlawful purpose or a lawful purpose by

unlawful means." *Bosak,* 192 Ill.App.2d at 803. A claim for fraud under Illinois law includes

the following elements: "(1) a false statement of material fact; (2) by one who knows or believes

it to be false; (3) made with the intent to induce action by another in reliance on the statement;

(4) action by the other in reliance on the truthfulness of the statement; and (5) injury to the other

resulting from that reliance." *Siegel Dev., LLC v. Peak Const. LLC*, 993 N.E.2d 1041, 1059, 373

Ill.Dec. 482, 500 (1st Dist. 2013).

In granting Plaintiff's earlier motion to dismiss, the Court explained that Leafs Hockey's

conspiracy to defraud allegations lacked sufficient detail under the Rule 9(b) heightened

pleading standard, including that Leafs Hockey did not explain who the Trustee threatened with

personal liability if the LHC board members did not extend CSCG's management contract.

Furthermore, Leafs Hockey's allegations failed to allege "an overt act of fraud in furtherance of

the conspiracy" or that there was any "concerted action" on the part of the Trustee. *See Bosak,*

192 Ill.App.3d at 803. In addition, although Leafs Hockey originally alleged a "scheme to

defraud," it did not allege that the Trustee had an agreement with the LaPato, Willett, Durkin,

and/or CSCG to defraud Leafs Hockey, which is a necessary element of a civil conspiracy claim

under Illinois law. *See Merrilees v. Merrilees*, 998 N.E.2d 147, 162, 375 Ill.Dec. 855, 870 (1st

Dist. 2013) ("To connect a defendant to a conspiracy, the complaint must allege the 'necessary

and important element' of an agreement.").

In its Amended Counterclaim, Leafs Hockey does not provide additional allegations

concerning who the Trustee threatened, the nature of the Trustee's agreement with LaPato,

Willett, Durkin, and/or CSCG to defraud Leafs Hockey, nor did Leafs Hockey allege that the

Trustee engaged in an overt act in furtherance of the conspiracy as the Court discussed in its

March 14, 2014, Memorandum, Opinion, and Order. In fact, Leafs Hockey fails to assert that

there was any agreement, but simply alleges that "Don LaPato, CSCG, John Willett, and Michael

Durkin have engaged in a scheme to defraud Leafs Hockey and to obtain Leafs Hockey's funds

for their own personal use." (Am. Compl. ¶ 229.) Once again, Leafs Hockey has failed to

sufficiently allege that the Trustee knew of the fraudulent scheme and voluntarily participated in

it. *See Tucker v. Soy Capital Bank &Trust Co.,* 974 N.E.2d 820, 835, 363 Ill.Dec. 23 (1st Dist.

2012) ("Civil conspiracy is an intentional tort and requires proof that a defendant 'knowingly

and voluntarily participates in a common scheme to commit an unlawful act or a lawful act in an unlawful manner.'") (quoting *McClure v. Owens Corning Fiberglas Corp.,* 188 Ill.2d 102, 133, 720 N.E.2d 242, 241 Ill.Dec. 787 (1999)).

Instead, Leafs Hockey relies on its breach of contract allegations that do not add sufficient details to the alleged conspiracy. Leafs Hockey also adds this allegation: "[The Trustee] willingly allow[ed] large amounts of LHC's cash to be paid to CSCG for its management services, even though the Indenture Trustee knew and understood that the dual role played by LaPato as a board member of LHC and the owner of CSCG imperiled the ability of LHC to obtain a non-homestead property tax exemption." (Am. Countercl. ¶ 234.) This additional language does not add details supporting the inference that the Trustee knowingly and voluntarily participated in a common scheme. *See McClure,* 188 Ill.3d at 133-34 ("Accidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy."). Rather, these allegations, taken as true, show that the Trustee knew that LaPato had duel roles prohibiting LHC's ability to get a non-homestead property exemption.

Moreover, Leafs Hockey continues to base many of its fraud allegations, including the newly alleged facts supporting its fraud claim, upon information and belief. *See Cincinnati Life Ins. v. Beyrer,* 722 F.3d 939, 948 (7th Cir. 2013) (courts "frown on making allegations 'on information and belief' in the fraud context and generally find that such claims do not meet Rule 9(b)'s particularity requirement."). In response, Leafs Hockey argues that the facts constituting fraud are not accessible because these facts are within the Trustee's knowledge. As explained in the Court's earlier ruling, even if the facts are inaccessible to Leafs Hockey, it must still provide some grounds for its suspicions that the Trustee was part of the conspiracy to defraud. *See*

12

*Pirelli*, 631 F.3d at 443 ("The grounds for the plaintiff's suspicions must make the allegations plausible, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail."). Discovery in this case has been ongoing for nine months and will close at the end of this month. As such, Leafs Hockey has had substantial time and opportunity to discover facts to support these allegations. It has failed to do so.

In the March 14, 2014, Memorandum, Opinion, and Order granting Plaintiff's motion to dismiss without prejudice, the Court provided Leafs Hockey with explicit directions on how to cure the deficiencies of its conspiracy to defraud claim, yet Leafs Hockey did not fix these shortcomings. Under the circumstances, the Court dismisses Leafs Hockey's conspiracy to defraud claim with prejudice. *See Airborne Beepers & Video, Inc. v. AT & T Mobility LLC*, 499 F.3d 663, 666-67 (7th Cir. 2007).

## CONCLUSION

For these reasons, the Court grants Plaintiff's motion to dismiss Leafs Hockey's conspiracy to defraud claim as alleged in Count I of the Counterclaim, but denies the remainder of Plaintiff's motion to dismiss.

**Dated**: July 31, 2014

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**

13